[Cite as *State v. Jackson*, 2020-Ohio-5339.]

JaCOURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |  |
|---|---|---|---|
| STATE OF OHIO | : | JUDGES: | |
|  | : | Hon. William B. Hoffman, P.J. | |
| Plaintiff-Appellee | : | Hon. W. Scott Gwin, J. | |
|  | : | Hon. John W. Wise, J. | |
|  | : | | |
| -vs- | : | | |
|  | : | Case No. 19CAC 05 0034 | |
| GREGORY JACKSON, JR. | : | | |
|  | : | | |
| Defendant-Appellant | : | OPINION | |

CHARACTER OF PROCEEDING:      Criminal appeal from the Delaware
Municipal Court, Case No. 18TRC12648

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      November 18, 2020

APPEARANCES:

For Plaintiff-Appellee          For Defendant-Appellant

AMELIA BEAN-DEFLUMER          JERMAINE L. COLQUITT
Assistant Prosecutor          33 West Main Street, Ste. 109
Delaware City Prosecutor          Newark, OH 43055
70 North Union Street
Delaware, OH 43015

*Gwin, J.,*

{¶1} Defendant-appellant Gregory Jackson, Jr. ["Jackson"] appeals his convictions and sentences after a jury trial in the Delaware Municipal Court.

*Facts and procedural History*

{¶2} Jackson was charged with Operating a Vehicle while Impaired in violation of R.C. 4511.19(A)(I)(a)(3rd offense in 10 years), Operating a Vehicle while Impaired and Refusing a Chemical Test with a prior within 20 years in violation of R.C.4511.19 (A)(2), Driving within Marked Lanes in violation of R.C. 4511.33, and Display of license plates and validation stickers in violation of R.C. 4503.21.

{¶3} Jackson filed a motion to suppress evidence on October 31, 2019. On February 8, 2019, the day scheduled for the hearing, Jackson withdrew his motion to suppress. A jury trial commenced on April 16, 2019. The following evidence was produced during Jackson's jury trial.

{¶4} On August 24, 2018, Lynn Weiss was driving on State Route 23 in Delaware County, Ohio when she noticed a vehicle travelling southbound in and out of traffic more so than one would normally drive if one were in a hurry. Ms. Weiss testified that she was concerned because the person was being dangerous and she had two children in the car. As a result, she asked her daughter to call 9-1-1.

{¶5} Twelve-year-old Josie Weiss testified that she called 9-1-1 on the date in question at her mother's instruction due to an unsafe driver. Josie noted that the vehicle was swerving "off and on throughout several lanes" and, that she believed that the driver

had a beer bottle and "raised it twice." 1T. at 165[1]. The state played into evidence the 9-1-1 call made by Josie.

{¶6} Ohio State Highway Patrol Trooper Scott Tallman testified to his qualifications and training as a State Highway Patrol trooper and his training and experience in identifying individuals who were operating a vehicle while impaired. Trooper Tallman testified that he was working on August 24, 2018, when he received a "BOLO" ("be on the lookout") for a reckless driver in a black jeep. He initially saw a dark blue jeep pass him in the area; however, thinking that it was not the correct jeep due to the color discrepancy he did not attempt to make contact with that vehicle. Trooper Tallman pulled into a car dealership on State Route 23, at which time dispatch updated the "BOLO" with the license plate number of the reckless driver. At this point, the same dark blue jeep had turned around and was traveling northbound on State Route 23, past Trooper Tallman. The Trooper was able to match the license plate from dispatch to the car and pulled out to investigate. The stop and subsequent interaction between Trooper Tallman and Jackson was recorded and was admitted into evidence and played for the jury. State's Exhibit 2.

{¶7} Trooper Tallman noticed as he followed the suspect vehicle that the vehicle changed lanes without using a turn signal and further committed a marked lanes violation. Trooper Tallman then initiated a traffic stop. Trooper Tallman testified that Jackson initially stopped in the middle of the road. After the trooper made an audible signal, Jackson accelerated at a pretty high rate of speed and jerked over to the shoulder. Trooper approached the vehicle and found only one occupant, Jackson.

---

[1] For clarity, the jury trial transcript will be referred to as, "__T.__," signifying the volume and the page number.

{¶8}   During his initial approach to the vehicle, Trooper Tallman noted that Jackson appeared "a little out of it." 1T. at 222. Trooper Tallman testified that there was an odor of alcoholic beverage coming from the car.  Trooper Tallman further testified that Jackson did not answer many of his questions, Jackson was not able to find his license, and although Jackson stated he was heading home to Dayton, he was traveling in the wrong direction to accomplish that goal. Trooper Tallman then requested Jackson to perform the Standardized Field Sobriety Tests. ["SFST's"].  Jackson declined.  At this point, Trooper Tallman placed Jackson under arrest for operating a vehicle while impaired, searched him incident to arrest, and placed Jackson in the rear of his cruiser. Because the vehicle was located on the side of the highway, Trooper Tallman made the decision to have the vehicle towed. Trooper Tallman therefore conducted an inventory search of the vehicle. While searching the vehicle, Trooper Tallman located three empty beer bottles in the passenger area as well as a purple water bottle with a liquid in it that had a "strong odor of alcohol." 1T. at 229.

{¶9}   Trooper Tallman then read the standard BMV 2255 form to Jackson regarding submitting to a chemical test. Trooper Tallman asked Jackson several times if Jackson wanted to take a breathalyzer test. Jackson did not answer Trooper Tallman, therefore, marked that Jackson had refused to submit to the test. Trooper Tallman noted that race played no role in his arrest of Jackson.

{¶10}  Defense counsel attempted to delve into the trooper's potential bias for concluding that individuals are impaired; however, the Court sustained objections by the state. Counsel cross-examined Trooper Tallman on whether race played a role in the stop, and whether Mr. Jackson's frustration or the racial dynamics - as opposed to

impairment- could have played a role in his reaction. At this point the Court again sustained several objections curtailing defense counsel's questioning of Jackson.

{¶11} Defense counsel played portions of State's Exhibit 2, noting that Trooper Tallman made several driving infractions himself though he was obviously not impaired, that drivers who are not impaired can drive in a similar fashion to Jackson, and that Jackson's driving maneuvers were reasonable under the circumstances. The Court again sustained several objections limiting this line of questioning.

{¶12} Defense counsel then pointed out that though the trooper noted Jackson had glassy and bloodshot eyes, there were no pictures or video to substantiate that claim. The defense then played back the video of Jackson leaving the vehicle, noting that he did not lean on the car as he got out and he walked without issue from the vehicle to the police cruiser. The defense then pointed out that the trooper did not seize the alleged alcohol in the water bottle but could have, that Jackson was largely compliant with the traffic stop, and as a result Trooper Tallman could have gotten a warrant for Jackson's blood.

{¶13} Jackson testified in his own defense. He categorically denied drinking that day. Jackson sought to explain his agitated behavior, noting that "people like [him] are constantly pulled over and harassed" by the police. 2T. at 334. He later clarified that by people like him he meant "black people." Id. Jackson indicated that he was attempting to meet new people through playing online video games, and that on the date in question he drove to Columbus to meet people he thought were his friends. However, once he arrived, they "took advantage" of him, making fun of him at every point they could and had him "driving everywhere." 2T at 336. As a result, Jackson testified that he had kicked

them out of the vehicle 20 or 30 minutes prior to the traffic stop. 2T. at 344. He indicated that they were the ones who were drinking in his vehicle and were responsible for the alcohol found inside his car during the inventory search of the vehicle. After this altercation, Jackson was turned around due to the fact that he was unfamiliar with the area and that his phone battery was dead. Jackson admitted that he did not explain any of this to Trooper Tallman during the traffic stop.

{¶14}   Jackson described the traffic stop, saying that he noticed Trooper Tallman behind him.  Jackson testified that he at first thought that Trooper Tallman was trying to get around him to the right. He indicated that he pulled forward in a quick manner due to frustration and his suspicion that the traffic stop was because he is black. Jackson testified he refused the breath test because he did not believe them to be reliable; however, he would have complied with a warrant for the removal of his blood.

{¶15}   Jackson testified that at that time of the stop he was feeling both sad and frustrated due to the fact that his anticipated friendly meet up had not gone as expected and that he was lost with a dead cell phone at the time.  He explained his poor driving as being a result of this frustration. Jackson adamantly denied drinking at that time or being intoxicated.

{¶16}   The jury ultimately found Jackson guilty of R.C.4511.19 (A)(I)(a) OVI impaired and R.C. 4511.19 (A)(2) OVI with refusal within 20 years. The state elected to sentence on R.C. 4511.19 (A)(2). The Court sentenced Jackson to $1,250 fine, 7 year license suspension, 5 years of probation, and 120 days in jail with credit for the 7 days he had previously served. In doing so the Court noted that this was his third conviction in 10 years.

{¶17} Jackson's initial appeal was dismissed for want of prosecution by Judgment Entry filed December 17, 2019. Jackson was granted leave to re-open his appeal by Judgment Entry filed June 11, 2020.

*Assignment of Error*

{¶18} Jackson raises one Assignment of Error,

{¶19} "I. THE TRIAL COURT DEPRIVED THE DEFENDANT OF HIS RIGHT OF CROSS-EXAMINATION IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION."

*Law and Analysis.*

{¶20} In his sole assignment of error, Jackson argues that the trial court's curtailment of his attempt to cross-examine Trooper Tallman concerning his potential bias violated his constitutional rights. Specifically, Jackson argues that he should have been permitted to ask Trooper Tallman "whether the trooper had ever testified that he thought a DUI Defendant was *not* under the influence and whether the trooper had ever testified on behalf of a defendant in a DUI case." Appellant's Brief at 10-11(emphasis in original).

**Standard of Appellate Review.**

{¶21} "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). "However, we review de novo evidentiary rulings that implicate the Confrontation Clause. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010)." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶97.

{¶22}   The Sixth Amendment of the United States Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." *Davis v. Alaska*, 415 U.S. 308, 353, 94 S.Ct. 1105, 39 L.Ed.2d 347(1974). [Hereinafter referred to as "*Davis*"].   That right, incorporated in the Fourteenth Amendment and therefore available in state proceedings under *Pointer v. Texas*, (1965), 380 U.S. 400, includes the right to conduct reasonable cross-examination.  *Davis*, 415 U.S. at 315-316.

Reasonable cross-examination includes not only the opportunity to impeach a witness: "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness".  *Davis*, 415 U.S. at 316 [94 S.Ct. 1105], but also the exposure of a witness' motivation in testifying: 'A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' 3A J. Wigmore Evidence Section 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in

testifying is a proper and important function of the constitutionally protected right of cross-examination. [415 U.S. at 317, 94 S.Ct. 1105]".

*Greene v. McElroy*, 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). *See also, Davis*, 415 U.S. at 316–317, 94 S.Ct. 1105, 39 L.Ed.2d 347; Olden *v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988); *Delaware v. Van Arsdall*, 475 U.S. 673, 678–679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Of course, a trial court can impose reasonable limits upon cross-examination:

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, and confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer* (1985), 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (per curiam) (emphasis in original).

*Van Arsdall, supra*, 475 U.S. at 679, 106 S.Ct. 1431.

{¶23} In determining whether the confrontation clause has been violated, the focus of the prejudice inquiry "must be on the particular witness, not on the outcome of

the entire trial." *Van Arsdall, supra* 475 U.S. at 680, 106 S.Ct. 1431. In *Van Arsdall, supra*, the United States Supreme Court held: "[w]e think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' *Davis v. Alaska*, *supra*, at 318, 94 S.Ct. 1105." *Van Arsdall, supra* at 475 U.S. at 680, 106 S.Ct. 1431; *See, also, Olden, supra.*

{¶24}   In *Van Arsdall, supra*, the Court stated,

The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. *Cf. Harrington [v. California]*, 395 U.S. [250] at 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 [(1969)]; *Schneble v. Florida,* 405 U.S. [427] at 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 [(1972)].

*Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431, 89 L.Ed.2d 674.

**{¶25}** We note that any error will be deemed harmless if it did not affect the accused's "substantial rights." Before constitutional error can be considered harmless, we must be able to "declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**Issue for Appellate Review.**

*Whether the trial court violated Jackson's right to confrontation by not permitting the defense to cross-examine Trooper Tallman concerning whether the trooper has ever thought an OVI defendant was not under the influence and whether the trooper had ever testified on behalf of a defendant in an OVI trial.*

**{¶26}** Jackson was not prejudiced by the trial court's exclusion of the contested evidence. Jackson was permitted to explore the driving at issue, issues concerning the report prepared by Trooper Tallman, the lack of pictures of Jackson's eyes, and the fact that Jackson did not lean or need assistance walking. The defense was permitted to explore the trooper's failure to preserve the fluid inside the purple water bottle found inside Jackson's car, the fact the Jackson was largely compliant with the trooper during the stop and the fact that the trooper could legally have obtained a warrant to draw Jackson's blood for analysis.

**{¶27}** We find that the jury had sufficient credible evidence from which to determine any alleged bias of the trooper. The jury was able to see and hear for themselves the interaction between Trooper Tallman and Jackson because the events were recorded. The additional information sought to be introduced was purely speculative. Jackson does not set forth a cognizable claim that had the trial court admitted the evidence, the jury would have found him not guilty.

{¶28}   In applying the factors set forth in *Van Arsdall*, supra, the trial court's refusal to permit cross-examination of the trooper on the contested issues to demonstrate bias was harmless beyond a reasonable doubt.

{¶29}   Accordingly, Jackson's right to confront and cross-examine Trooper Tallman pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution were not violated.

{¶30}   Jackson's First Assignment of Error is overruled.

{¶31}   The judgment of the Delaware Municipal Court, Delaware County, Ohio is affirmed.